IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 25, 2002

## JOANN GAIL ROSA v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Knox County**
**No. 70102     Richard R. Baumgartner, Judge**

**No. E2002-00437-CCA-R3-PC**
**March 17, 2003**

The petitioner appeals the dismissal of her petition for post-conviction relief from her conviction for first degree murder, arguing that the post-conviction court erred in finding that she received effective assistance of trial counsel. After a thorough review of the record, we conclude that the petitioner failed to demonstrate either a deficiency in counsel's performance or a resulting prejudice to her case. Accordingly, we affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

Leslie M. Jeffress, Knoxville, Tennessee, for the appellant, Joann Gail Rosa.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; Randall E. Nichols, District Attorney General; and G. Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In 1996, the petitioner, Joann Gail Rosa, was convicted by a Knox County Criminal Court jury of first degree premeditated murder and was sentenced to life imprisonment with the possibility of parole. Her conviction and sentence were affirmed by this court on direct appeal, and her application for permission to appeal to the supreme court was denied. See State v. Rosa,[1] 996 S.W.2d 833, 840 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1999). The petitioner's conviction stemmed from her participation with a codefendant in strangling a man to death to

---

[1]The direct appeal opinion refers to the petitioner by the name "Joanna Gail Rosa." In this appeal, however, the petitioner's first name is listed as "Joann" rather than "Joanna."

prevent his reporting that the petitioner, her codefendant, and a third individual had robbed a service station. The direct appeal opinion provides the following account of the circumstances that led to the murder:

On March 25, 1995, the defendant; her co-defendant, Dennis Halcomb; the murder victim, James Dalton; and two friends, Teresa Dake and Larry Davis, rented two adjoining motel rooms in Athens, Tennessee, and spent the evening "partying." The next day, the group decided to spend another evening at the motel. That evening, while Dalton and Davis remained at the motel, the defendant, co-defendant Halcomb, and Dake robbed the gas station where Dake worked.

Early the next morning, on March 27, 1995, the group left Athens and drove to Knoxville, stopping at another motel, where they again rented adjoining rooms. The defendant, co-defendant Halcomb, and Dake expressed concern that Dalton would report the robbery to authorities. The defendant said they were going to have to "do something" to keep him from "saying anything." Later, while Davis and Dake slept in one of the motel rooms and Dalton slept in the other, the defendant and co-defendant Halcomb discussed what to do about Dalton. They planned to take Dalton's wallet and car, and Halcomb said he was going to knock Dalton out. The defendant took Dalton's keys and wallet and put them in the room where Dake and Davis were sleeping.

When the defendant returned, Dalton confronted codefendant Halcomb about his missing keys and wallet. Halcomb, who was approximately 6'3" and weighed over 200 pounds, began hitting Dalton, who was approximately 5'4" and 145 pounds. Halcomb held Dalton's neck in a choke-hold and asked the defendant to help him. While Dalton was on his knees leaning over the bed, the defendant grabbed the front of Dalton's throat and choked him, even while Dalton gasped for air and begged her to stop. Halcomb removed Dalton's belt from his pants, placed it around Dalton's neck, and told the defendant to hold the belt. While Halcomb went to the restroom, the defendant choked Dalton with the belt until his face turned blue. When Halcomb returned, the defendant checked Dalton for a pulse, but did not find one.

They drove Dalton's body to an area of town with which the defendant was familiar. After the defendant sliced Dalton's throat with a box cutter to ensure he was dead, they dumped his body on the side of the road, covering it with leaves. They returned to the motel,

picked up Dake, and traveled in Dalton's car to Illinois to visit the defendant's family and then to Daytona Beach, Florida.

Meanwhile, Dalton was reported missing. On April 3, 1995, Sherry Wade, a friend of Dake and the defendant, received a call from the defendant. Knowing Dalton was missing and thinking he might be with them, Wade asked the defendant where Dalton was. At first, the defendant replied she did not know, but then she told Wade "he was gone; he's gone; he's under a tree." A couple of days later, Wade reported this conversation to the McMinn County Sheriff's Department.

On April 6, 1995, the defendant, her co-defendant, and Dake were apprehended in a traffic stop while driving Dalton's vehicle in Florida. During an interview by the Florida authorities, the defendant initially denied knowing anything about Dalton's disappearance, but she later drew a map showing where his body was buried. Using the map, Tennessee authorities found the body. The defendant was arrested and waived extradition to Tennessee where she was indicted. Following her jury trial, which was severed from co-defendant Halcomb's trial, the defendant was found guilty of first-degree murder and sentenced to life imprisonment.

Id. at 836.

On February 29, 2000, the petitioner filed a *pro se* petition for post-conviction relief. Counsel was appointed and, on September 11, 2000, an amended petition was filed. The petitioner asserted trial counsel was ineffective, *inter alia*, for failing to adequately prepare and investigate the case, failing to adequately prepare her trial testimony or advise her of her right not to testify, and failing to investigate, develop, or present an intoxication defense.[2]

The petitioner testified at her January 31, 2002, evidentiary hearing that her trial counsel met with her in jail only three or four times during the year and a half she spent awaiting trial. During those visits, the main topic of conversation was counsel's efforts to obtain a plea bargain; however, trial counsel never informed her of any plea bargain offered by the State. Trial counsel also failed to inform her of the strategy he intended to employ at trial and, with the exception of the statements she had made to police, did not discuss the evidence against her. The petitioner said trial counsel told her that her statements were incriminating, but did not review them with her in detail and did not prepare her trial testimony. She also claimed trial counsel failed to inform her that she had the

---

[2]The petitioner also alleged trial counsel was ineffective for failing to have the tape recordings of her statements to police played before the jury. The petitioner has, however, abandoned this latter claim in her appeal to this court.

option of not testifying. However, at a later point in her direct examination testimony, she said she remembered counsel's having recommended that she testify on her own behalf at trial.

The petitioner testified that she had had several beers, "a few Zima's," "a bottle of Jack Daniels," and several glasses of vodka in the hours before the murder. She did not "actually go into detail" with trial counsel regarding what and how much she had drunk, but she did tell him that she had been drinking vodka and beer, that she had drunk "quite a bit," and that there were things that occurred that she could not remember. However, trial counsel never discussed using her intoxication as a possible defense at trial.

On cross-examination, the petitioner claimed that she had been too drunk to know exactly what she was doing at the time of the murder. She also asserted that her participation in the murder was coerced by threats from her codefendant, Halcomb,[3] whom she feared. She had no memory of having slashed the victim's neck after he was strangled to ensure that he was dead; she had learned that and other details of the murder that she had included in her statements to police from her "charge partners" the morning after the crime. However, in spite of her claim that she was too intoxicated to remember much of what had occurred, the petitioner provided numerous specific details about the murder as her cross-examination testimony continued. The petitioner acknowledged there was nothing preventing her from leaving the room during the murder, and that she had not tried to telephone anyone for help.

The opinion of this court on the direct appeal of the petitioner's conviction provided details of her confession and her actions following the crime:

> According to the defendant's confession, she and Halcomb planned to take Dalton's wallet and car. The defendant admitted helping Halcomb choke Dalton, first with her hand and then with Dalton's belt, even though he begged her to stop. After Halcomb left the room, the defendant continued to choke Dalton until his face turned blue. When asked what she was trying to accomplish by choking him, the defendant told authorities, "Kill him, I guess." These circumstances establish that the defendant acted after the exercise of reflection or judgment and with a previously formed intent to kill, which supports a finding of premeditation.
>
> The evidence also showed that immediately after the killing, the defendant helped choose an isolated area to dump Dalton's body and then covered the body with leaves to prevent detection. The defendant told authorities that she kept Dalton's wallet in order to prevent the body from being identified. She also admitted in her

---

[3]We note that the petitioner's codefendant's name is spelled "Halcombe" throughout the transcript of the evidentiary hearing. However, we will utilize the spelling contained in the direct appeal opinion in this case.

confession that she sliced Dalton's throat to ensure he was dead. Then, she, co-defendant Halcomb, and Dake fled to Illinois, where they visited the defendant's family as if nothing had happened.

Rosa, 996 S.W.2d at 837 (footnote and citations omitted).

As explained in the opinion of this court on direct appeal, at trial the petitioner had testified contrary to her confession, minimizing her role in the slaying of the victim and explaining that she had cut his throat as an act of compassion:

> We recognize that at trial, the defendant contradicted her confession, testifying that she did not choke Dalton or intend to kill him; that she loosened the belt around his neck in order to allow him to breathe; that Halcomb, who was upset, choked Dalton until he died; and that she cut Dalton's throat solely to prevent his suffering.

Id.

Trial counsel testified he had been practicing law for eleven years as of the time of the hearing, and estimated he had participated in twenty to twenty-five jury trials. He said he had been appointed to represent the petitioner in May 1995, roughly a month after the murder occurred. As part of his investigation, he had obtained and reviewed copies of the statements the petitioner had made to police. Trial counsel testified that he had "tried a great number of murder cases and other cases" during his career, but had "never had a confession any more incriminating" than the one in this case. Because the petitioner had made such incriminating statements, he had thought "the best trial [they] could have . . . would be no trial at all," and therefore concentrated his efforts on working to obtain a plea bargain, as well as trying to suppress the petitioner's statements.

Trial counsel testified he kept the petitioner informed of the progress in her case and the plea negotiations on her behalf. In addition to their four meetings at the jail, they also met at least half a dozen times prior to various motions or hearings. He told the petitioner of the State's only plea offer, which was life, plus ten years for a conspiracy count the State was going to add to the indictment. Trial counsel said he explained to the petitioner that he did not think it was "any offer at all," because the conspiracy charge had not even been made at that time, and that they ultimately beat the offer with the life sentence the petitioner received at the end of the trial.

Trial counsel testified he was aware from his conversations with the petitioner and his review of her statements that she had been drinking beer and vodka on the evening of the murder, but did not know that, supposedly, she had been drinking Jack Daniels as well. Regardless, he did not think voluntary intoxication was a viable defense. The petitioner's statements to police were very fact-specific, and there was nothing in his conversations with the petitioner to indicate that she had not been aware of what she was doing at the time of the murder. Trial counsel explained:

First of all, I didn't see anything in my conversation with [the petitioner] to indicate that she was intoxicated to the point that it would even be an issue. We are talking about that now, but nowhere in my speaking with her and nowhere in the testimony and the statements that I had seen had there been any talk about that level of intoxication. In my experience, when you are going to use that to negate an element of premeditated murder, you are talking about a pretty intoxicated state, and I just did not gather that from my speaking with [the petitioner] and the things that I was reading about her statements[.]

Trial counsel said he was not aware of any case in Knox County during the eleven years he had practiced law in which a defense of voluntary intoxication had been successful. He thought it was a "very risky" defense because, in his opinion, "if [the] jury believes for a moment that you are trying to hide behind some voluntary intoxication, and they think that you did in fact know what you were doing, . . . they will see that as an excuse, and they will punish you for it."

Trial counsel said he recommended that the petitioner testify because he thought they had no choice, once the statements were admitted, other than to have her attempt to explain certain parts of them to the jury. Although he did not go over the statements with the petitioner in person before trial, he did provide her with copies of them to review with instructions that she mark the parts that she remembered and any parts that were inaccurate. Trial counsel said he did not know how he could have prepared the petitioner any differently, testifying that, in his opinion, "there wasn't a whole lot of preparation that [they] could do" with respect to the statements. He testified he talked at length with the petitioner prior to trial about the facts surrounding the murder, including her relationship with Halcomb, his intimidating size, and the fear she had felt of him, and that he brought out those details during her direct examination at trial. He also attempted, unsuccessfully, to have Halcomb called as a witness at trial, knowing he would plead his Fifth Amendment right against self-incrimination, but in doing so, the jurors would see how large he was. In trial counsel's opinion, there was nothing he could have done differently in the case.

At the conclusion of the post-conviction hearing, the court made oral findings of fact and conclusions of law and, on March 12, 2002, entered an order dismissing the petition, finding that the petitioner had failed to sustain her burden of demonstrating ineffective assistance of counsel. Although the order dismissing the petition states that the court's "Memorandum Opinion shall be incorporated herein by reference," there is no memorandum opinion in the record. Thereafter, the petitioner filed a timely appeal to this court, challenging the post-conviction court's dismissal of her petition.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). When an evidentiary hearing is held

in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461.

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient, and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason, courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

Initially, we note the post-conviction court announced its findings at the conclusion of the hearing and directed the court reporter to transcribe them into a memorandum opinion. However, there are no written findings in the technical record. Although the technical record index refers to a multiple-page order dismissing the petition, the reference is actually to a transcript of the sentencing phase of the petitioner's convicting trial. Nevertheless, the post-conviction court's findings and conclusions are sufficiently comprehensive to allow for proper appellate review.

The petitioner contends trial counsel was ineffective for failing to adequately investigate and prepare for trial and failing to investigate or develop an intoxication defense. She argues that counsel was deficient for failing to discuss his trial strategy or defense theory with her, neglecting to inform her of her right not to testify or adequately prepare her trial testimony, and for failing to explore or develop her intoxication as a defense, despite evidence that she was drinking heavily at the time of the murder. The petitioner contends that "had the jury been fully apprised of her inebriated condition at trial, a different result . . . would have been obtained." The State responds that the petitioner failed to establish that trial counsel's performance fell below the range expected of an attorney in a criminal case or resulted in prejudice to the outcome of her case. We agree with the State.

The petitioner claimed that trial counsel met with her only three or four times prior to trial. She said he failed to communicate any plea bargain offered by the State, failed to inform her of her right not to testify, failed to discuss his trial strategy or an intoxication defense, and failed to prepare her trial testimony. Trial counsel, by contrast, testified that he met with the petitioner at least ten times before trial, with some of these meetings occurring in jail and others as she was brought to court. He said he discussed the facts of the case with her, including the statements she had provided to police and her fear of her codefendant; communicated the only plea bargain offered by the State; and prepared her trial testimony by, among other things, providing her with a copy of her statements for her to review and mark. Trial counsel acknowledged he concentrated at the outset on suppressing the statements and attempting to negotiate a plea bargain, explaining that the petitioner's detailed confession made him believe that their best option was to seek a plea bargain to avoid going to trial. However, when it became clear that the statements were going to be admitted and they were going to trial, he recommended that the petitioner take the stand. Trial counsel testified:

> There is nothing at all that we could have done differently in my opinion. This case boiled down to a statement, a confession, a series of confessions that were not contradictory of one another. Once those statements came in, we had no choice but to go forward. Yes, I advised her to testify. It was my opinion that, once those statements were coming in, we had no choice but to explain to the jury, and I explained to [the petitioner] that, in my opinion, we didn't have any choice but to testify; because, if we just sat silent, and all they were going to do is hear these things without her explaining certain parts of it, that we would have no chance of success.

As to this issue, the post-conviction court found:

> But she claims here today that [trial counsel] was ineffective in his assistance and raises three or four different specific charges, the first being that [trial counsel] failed to adequately consult with her and prepare her for this trial. She claims that she only met with him three times during the period between April and September – April, '95 to September, '96, and that their discussions were generally confined to the issue of what plea agreement, if any, was forthcoming.
>
> [Trial counsel] acknowledges, candidly, that he did not visit with her a great number of times in the jail, maybe on four occasions in the jail, as I recall his testimony. However, he goes on to explain that, on a number of occasions when [the petitioner] would be brought to the courtroom for motion hearings, that they would have the opportunity to meet and discuss trial preparations and trial strategy in the courtroom, in addition to his meetings in the jail.
>
> . . . .
>
> With regard, however, to this claim that there was ineffective discussions between the two of them, while there may not have been as many discussions in this case as there are in some cases, I have failed to hear any evidence presented by [the petitioner] how that affected her adversely in this case.
>
> [Trial counsel's] testimony is that he did meet with her on a number of occasions, both in the courtroom and in the jail; that he investigated the case, attempted to talk to the witnesses that were identified to him and indeed visited the scene, obtained evidence to familiarize himself with the case, but that his main thrust was in an effort to negate the damaging effect of this statement that was given by [the petitioner] to law enforcement officers.

Trial counsel's concentration on suppressing the statements and obtaining a plea cannot be considered unreasonable, given the incriminating nature of the statements the petitioner made to police. Furthermore, his testimony regarding the level of communication he maintained with the petitioner and his investigation and preparation for trial supports the post-conviction court's finding that he provided effective assistance to the petitioner at trial.

The petitioner also contends that trial counsel was ineffective for failing to investigate or develop a voluntary intoxication defense. However, by her own testimony, she failed to inform him

of all that she had had to drink.[4]  Moreover, even if she had told him everything, we agree with trial counsel that the level of detail the petitioner was able to provide about the murder belies her claim of having been too intoxicated to form the specific intent to commit first degree murder.  During her testimony at the evidentiary hearing, the petitioner first claimed that she had been too intoxicated to remember much of what occurred.  She then went on to provide a substantial number of details about the murder, including that Halcomb struck the victim in the chest and bent him over the bed as he began strangling him; that the victim's face turned a "bluish color" as he was being choked; that she fearfully obeyed Halcomb's instructions that she "had better help" by pressing her hands on the front of the victim's neck for several minutes while he removed the victim's belt and placed it about his neck; that Halcomb then choked the victim by tightening the belt and made her help by pulling on the belt also; that Halcomb went into the adjoining room at one point and she loosened the belt around the victim's neck while he was gone; that the victim was still breathing when Halcomb returned to finish the job; and that she helped dispose of the victim's body after he was dead.

As to this issue, the post-conviction court found:

> [The petitioner] also raises this issue of the fact that her level of intoxication was not explored as a defense.
>
> Again, my recollection in this case has been – it has been three or four years since this case was tried – but my recollection was that there was a good deal of testimony about what went on in this motel – or I think there were two motel rooms – and the fact that they were partying, and that there was drinking going on.
>
> As I recall, they had gone to a 711-type establishment, and I think some people stole some items from that establishment, including some alcoholic beverages.  And there was a good deal of testimony about what had gone on – all the things that had gone on at this motel leading up to the incident in which this individual lost his life, and [trial counsel] testifies here today that he did not – that [the petitioner] did not disclose to him what she now claims to be this level of intoxication that she had at the time.
>
> Again, I have heard nothing here today that convinces me that [trial counsel] was ineffective in developing the facts of this case or presenting these facts to the jury.  I don't think this issue of intoxication rises to the level of ineffectiveness by [trial counsel].

---

[4]We note that according to an excerpt from her trial testimony which is an appendix to her brief, she was asked the general question, "What were you drinking?" and responded, "Vodka and beer."  Although this general question would have allowed the petitioner to explain that she also had been drinking Jack Daniels, she did not do so, nor did she explain at the post-conviction hearing why she had not told the jury of all the alcohol she was then claiming she had consumed at the time of the murder.

As we understand, the petitioner makes a twofold argument as to trial counsel's not presenting an intoxication defense: his pretrial investigation was ineffective because he did not discover that she was intoxicated at the time of the crime, and his trial performance was ineffective because he did not proceed with an intoxication defense. However, the facts of the killing undercut these claims. First, trial counsel's only sources for learning of the petitioner's level of intoxication at the time of the crime were the petitioner, herself, and the others involved, all presumably represented by counsel: her codefendant, Dennis Halcomb, who had helped her murder the victim; Teresa Dake, their companion, with whom Halcomb had just robbed a gas station; and Dake's companion, Larry Davis. Trial counsel testified at the hearing that he knew if Halcomb were called as a witness, he would assert his Fifth Amendment privilege against self-incrimination. Thus, the petitioner's claim as to the benefit of an intoxication defense ignores the practical problems in presenting such a defense, and the fact that the only other persons available to testify as to her intoxication would have had reasons for not wanting to testify and incriminate themselves. Additionally, we note that while the petitioner, herself, could have testified as to her level of intoxication, she did not do so, and now suggests that she may not have wanted to testify at the trial. Other reasons are apparent as to why the petitioner's trial attorney would not have attempted to present an intoxication defense. The recitation of the facts, as set out in the direct appeal, shows that the petitioner had substantial recall of the events, as we have stated, and also reveals that, upon her subsequent arrest in Florida, she drew a map for authorities accurate enough to result in the recovery of the victim's body. Thus, we conclude, as did the trial court, that the petitioner failed to establish that trial counsel was ineffective for not presenting an intoxication defense.

The petitioner has failed to acknowledge the difficulty faced by her trial counsel after he was unsuccessful in suppressing her statement, according to which, after choking the victim until his face turned blue with a belt around his neck, she then used a box cutter to slash his throat. The petitioner alleged on appeal that trial counsel "did very little to prepare for the eventual trial," stating that counsel met with her three or four times while she was awaiting trial, although meeting in court on other occasions; did not advise her that she had a choice as to whether to testify at the trial; and did not discuss "trial strategy, defense theory or how counsel intended to present her case." Additionally, she claims that she and trial counsel "did not go over in detail the statements she gave to authorities," although they "were the heart of the prosecution's case." However, the petitioner did not suggest, either at the hearing or in her appellate brief, how her defense either would have changed or been strengthened had she met with trial counsel on more occasions and discussed trial strategy. The record fully supports the finding of the post-conviction court that the petitioner failed to establish that trial counsel was ineffective.

## CONCLUSION

We affirm the dismissal of the petition for post-conviction relief.

ALAN E. GLENN, JUDGE

-11-